

CORRECTIONAL EXPERT OPINION REPORT
PREPARED BY GEORGE R. HARDINGER

IN THE CASE OF

JIMMIE JOSHUA, PLAINTIFF

vs.

ISAAC WACHHOLZ, et. al., DEFENDANT

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
CIVIL ACTION NO: 3:22-CV-00024
_____

This report is prepared pursuant to and consistent with Federal Rules of Civil Procedure 26(a)(2)(B) regarding the requirements for the content of an expert witness's report.  I reserve the right to revise or supplement this report should additional information be provided.

I was retained by The Law Firm of Gingras, Thomsen & Wachs, LLP, Madison, Wisconsin, as an Expert Witness in the areas of correctional facilities management and operations. My scope of work is to review the circumstances surrounding the incarceration of Jimmie Joshua (Plaintiff) in the Dane County Jail and specifically the incident on December 23, 2020, when Plaintiff was injured. During the use of force initiated by Deputy Sheriff Isaac Wachholz, (Defendant A), Plaintiff suffered serious physical injuries and emotional anguish and distress when force was employed.  The use of force in situations where force is not required or appropriate may rise to the level of a U.S. Constitutional violation of the 8th Amendment that prohibits cruel and unusual punishment. Using force when the use of force is premature, unwarranted, inappropriate and/or unprofessional is the use of excessive force which is a violation of the 8th Amendment.

The factual allegations are that on December 23, 2020, when Plaintiff was housed in a single cell in Housing Unit 705, he initially failed to lock in his cell as directed by Defendant A.  After deciding to move Plaintiff to another housing unit for disobeying his order, Defendant A indicated (gestured) to Sheriff Deputy Sean Shotliff (Defendant B) that he would be initiating a use of force and to call for back-up. While Plaintiff was clearly retreating towards his cell, Defendant A decided and immediately acted to individually go hands on – initiating a physical confrontation - with Plaintiff by grabbing his right arm to prevent him from entering his cell as initially ordered. As additional deputies (Defendant B) and Deputy Sheriff Ben Poquette (Defendant C) arrived in response to the call for assistance the incident further escalated first in the cell and then outside the cell as Plaintiff was forcibly taken to the floor of the dayroom that

is immediately outside Plaintiff's assigned cell. It was at this point that Plaintiff's right hip was seriously injured when his left leg was pulled out from under him causing him to fall to the floor with the weight of three deputies on top of him. Once he was securely restrained by numerous other Sheriff Deputies, Plaintiff was quickly checked by medical staff and then removed from the housing unit using a restraint chair. It is noted that Plaintiff immediately complained about having severe pain in his right hip and that he was unable to move.

My review is limited to those documents or information provided to me as listed in Section (ii) of this report. Based on my formal education, professional training, extensive administrative experience, a recognition as an Expert in Correctional Facilities Operations and Management and as a certified Subject Matter Expert in Correctional Leadership, I was asked to opine on the allegations presented in the Plaintiff's Compliant.

### (i)    Complete statement of opinions

Having reviewed and carefully analyzed the documents provided I have prepared this report which outlines my findings and opinions that are based solely on the pertinent information provided to me. I conducted no independent research. I did use the American Correctional Association National Standards and the U.S. Department of Justice guidelines regarding the use of force as references. The information was analyzed in relationship to the constitutional duties and responsibilities of the Dane County Sheriff's Office (DCSO) personnel, the administrators, supervisors and other personnel having the duties and responsibilities for assuring that the Dane County Jail (DCJ) is operated in a safe, secure, humane and professional manner. More specifically that the Policies and Procedures relevant to the lawful Use-of-Force are strictly adhered to and that the contemporary standard of care which calls for reasonable efforts to be made to protect inmates from serious harm is the guiding principle for managing the operations of the DCJ. My review and analysis of the December 23, 2020, use of force incident involving Plaintiff, considered both national and state standards, recognized correctional security best practices and the relevant policies, practices and customs of the of DCSO. My review included in part the training and experience of Deputy Defendants involved in the incident to execute their duties in a professionally competent manner.

I am prepared to testify in support of these findings which are based on the factual documents and other information provided in discovery and on my experience and expertise in the field of correctional facilities practices, operations and management.

In my opinion there were clear violations of the established standard of care and the applicable policies of the DCJ pertaining to the Use-of-Force on December 23, 2020. The record reveals that the DCSO, and specifically the DCJ, failed to act to protect the health and safety of Plaintiff. Where the Use-Of-Force continuum is concerned, beyond one's physical presence and direct commands, the requirement to employ a Use-of-Force is that there is a clear or imminent threat to someone or something, for example, an inmate who is at risk of self-harm or suicide,

a threat to the health or safety of another inmate, a threat to any staff member, volunteer, visitor, etc. or the individual is actively engaged in the destruction of property.  This is to say that a reasonable person could discern that the subject inmate clearly posed a risk of imminent harm.  In the absence of a risk of harm to someone or the destruction of property, an escalated level of force should be used only as a last resort. The lowest level of force that is available and appropriate is to be used to control, mitigate or eliminate the threat of bodily harm or the destruction of property.  In a secure correctional facility where a there is no threat of bodily harm to an inmate or staff the contemporary best practices call for a calculated or planned response versus a spontaneous reactive, or immediate response.

My review and analysis of the various reports and the video recordings reveal that on December 23, 2020, the use of force was brought to bear by Defendant A by individually going hands on with Plaintiff when he was not a threat, not a threat to himself, Defendant A, any other staff member, or any other inmate and there was no destruction of property taking place. The parameters or guidelines for using physical force were clearly not met, thus the use of force was, in my opinion, excessive.  The call for assistance had been made and back-up was immediately enroute.  In a matter of seconds, one, then two and in short order eight additional sheriff deputies arrived on the scene. Without seeking authorization, Defendant A deliberately escalated the situation into a physical use of force that resulted in serious injuries to Plaintiff.

When authorized, the Sheriff's Deputies at the DCJ must use only that level of force necessary to gain control of an inmate to protect an ensure the safety of other inmates, staff and others, to prevent serious property damage, and to ensure institution security and good order. DCJ Sheriff Deputies are only authorized to apply a use of force or physical restraints to gain control of an inmate who appears to be dangerous. To be considered dangerous, an inmate's behavior must demonstrate that they are:

A. at risk of self-harm or suicide;
B. assaulting or clearly preparing to assault another individual;
C. are destroying government or private property; or
D. violent, becoming violent or displaying signs of imminent violence.

**Discussion:** There can be no debate that it is a primary duty and responsibility of elected or appointed officials - and the managing official/Warden of a secure correctional facility - to assure that reasonable efforts to protect inmates from serious harm are established as written policy and procedures, and then that the procedures are carried out. The outcomes need to be systemically evaluated to determine if inmates are being protected from serious harm from other inmates and/or staff. This is the required standard of care regarding the safety and welfare of inmates. To meet this responsibility, each Serious Incident and Use of Force shall be documented, reported, and reviewed.  Where there is serious injury to staff or an inmate, or there is a significant amount of property damage, the incident shall be analyzed for the purpose of improving operations and upgrading training protocols as appropriate. There is no

3

information in the file that the prevailing standard of care was met beyond a written policy that is barely germane to the operations of the DCJ. In fact, the DCJ is rarely mentioned in the DCSO's Policy and Procedure Manual, Section: 200.520, Subject; Use of Force that mostly pertains to law enforcement operations outside the DCJ. Without noted amendments, changes or corrections the Policy and Procedure is dated March 18, 2008.  Such an outdated P&P should not be the basis upon which training is conducted. The training provided to Sheriff's Deputies assigned to work in the DCJ may meet minimum standards, but the procedures and training are in part outdated and inadequate to prepare staff to implement the use of force protocols in a secure correctional setting.

Since some inmates occasionally become violent or display signs of imminent violence, it is sometimes necessary for staff to use force and/or restraints to prevent them from hurting themselves, staff, or others, and/or destroying property.  Generally, the use of force falls into one of two categories.  The categories are:

   A. **Immediate Use of Force**.  Security staff may immediately or spontaneously use force/or apply restraints when the behavior of an inmate constitutes an immediate, serious threat to the inmate themselves, staff, others, property, or to the security and good order of the institution. In an immediate use of force situation, staff may respond with or without the presence or direction of a supervisor.
   B. **Calculated or Planned Use of Force.**  This category occurs in a situation where an inmate is in an area that can be isolated (e.g., a locked cell, housing unit, or any area that is clearly secured) and where there is no immediate, direct threat to the inmate, or others. When there is time for a calculated or planned use of force staff must determine if the situation can be resolved without resorting to physical force, chemical weapons, electronic devices, etc.  To the extent possible an experienced supervisor should plan and oversee a use of force response.  The use of a handheld video with audio is recommended to record the details of a use of force response.

Contemporary best practices call for a calculated rather than immediate use of force in all instances where correctional employees encounter a potential use of force situation.  Although this is not always possible, correctional personnel must use common sense and good correctional judgment in each incident to determine whether the situation allows for the implementation of a calculated or immediate use of force procedures and protocols.

To be clear, a calculated use of force is appropriate, for example, if the inmate is in a secure area or in an area where doors/grills may be secured, including cases when the inmate is non-compliant, making verbal threats or brandishing a weapon, provided staff believe there is no immediate danger of the inmate inflicting injury or harm to himself/herself or others.  A calculated use of force allows for the use of other staff (e.g., a supervisor, a prepared response team, a negotiator, psychologists, chaplain, etc.) to attempt to resolve the situation non-confrontationally.  The goal must always be to reduce the risk of harm to staff and inmates.  To

4

accomplish the goal, sound professional judgment and professional conduct is necessary in every instance.

On December 23, 2020, at approximately 1830 hours Plaintiff was housed in Housing Unit 705 that contains only four single cells.  Plaintiff was the only one out of his cell at the time as is the normal practice.  While Plaintiff refused to lock-in at the end of his rec time, he did not threaten Defendant A in any way, he did not possession a weapon, and he did not take an aggressive stance or move towards Defendant A.  He did not physically resist until Defendant A grabbed him by the arm to prevent him from entering Cell C, his assigned cell.  It is my opinion that a calculated response was clearly an option, and the circumstances called for a planned response that could have included a supervisor or others to defuse the situation.  The circumstances did not require an immediate hands-on use of force by one or more deputies.

Over the last twenty-five years, the Use of Force Team Technique has proven highly successful in preventing serious injuries to inmates and correctional personnel.  If the use of force is determined to be necessary, and other means of gaining control of an inmate are deemed inappropriate or ineffective, then the Use of Force Team Technique shall be used to control the inmate and apply restraints.  The Use of Force Team Technique involves trained staff, clothed in protective gear, who enter the area in tandem, each with a designated responsibility for achieving immediate control of the inmate.

**My Review and Analysis**: The record reveals that the use of force incident on December 23, 2020, involving Plaintiff Joshua and Defendant Sheriff Deputy Isaac Wachholz, et. al., was an inappropriate immediate or spontaneous response to a situation where the circumstances clearly called for a calculated or planned response.  The video recordings and the written incident reports by Defendants A, B, and C are consistent in that Plaintiff was not a threat to himself or others and that he was in a secure and isolated area.  At the time that Defendant A intentionally decided to escalate the situation by individually going hands-on by grabbing the right arm of Plaintiff in an apparent effort to prevent him from entering his cell, there was no risk of the Plaintiff inflicting self-harm or committing suicide, there was no apparent risk to others and no destruction of property.  For reasons that have not been discerned, Defendant A deliberately acted to violate the constitutional rights of Plaintiff to be reasonably safe from serious harm, and Plaintiff was seriously harmed.

The situation allowed for a calculated or planned response that may or may not have involved the use of force.  For example, a "show of force" by a Use of Force Team may have resolved the incident to include removing Plaintiff from the 705 Housing Unit.  A more experienced Sheriff's Deputy or supervisor may have talked him down, or the threat of employing mace or a Taser may have resulted in the inmate complying with the decision to remove him from the housing unit. The decision to escalate the situation thwarted the opportunity to defuse the situation.

The video recordings of the December 23, 2020, use of force incident against Plaintiff and the related Incident Reports by the Sheriff Deputies that were involved in the incident are

reasonably consistent. The video recordings clearly document the events as they transpired and captured the moment that Defendant A arbitrarily decided that Plaintiff would be removed from Housing Unit 705. More importantly, the video recordings capture the very second that Defendant A decided to individually go hands-on, initiating a physical confrontation with Plaintiff by grabbing his right arm. It was Defendant A's decision to escalate the situation. This fateful, deliberate decision was made even though additional Sheriff Deputies were enroute, nearby, only seconds away. It is my opinion that by any standard the escalation of the use of force was deliberate, unnecessary, premature and inappropriate. There was no thought given to avoiding injury to Plaintiff or others.

There is nothing in the record to support that Defendant A considered pursuing a calculated or planned response to the situation. He did not attempt to contact a supervisor for guidance or to discuss alternatives with his partner, or to wait for assistance to arrive. There was no reasonable effort made to avoid a physical confrontation, i.e., a use of force. Failing to have considered the alternatives and to follow the applicable policy and procedures regarding a use of force Defendant A deliberately acted to place Plaintiff at risk of serious harm. As a result, Plaintiff was serious harmed on December 23, 2020.

**Summary**

It is the responsibility of elected officials and top-level administrators to ensure that adequate resources, supervision and effective training are provided to operate a correctional facility in compliance with legally mandated minimum standards, recognized standards of decency, and that institutional policies and procedures are professionally developed and executed. In this case Defendants failed to competently oversee the operations of the DCJ, and furthermore no remedial action is noted.

To be successful, a Use of Force Program must have clearly written policies and procedures that are thorough, current and tailored to the conditions and situations that employees are likely to encounter during their normal course of duties. The academy and in-service training in the use of force must be comprehensive and detailed based on circumstances that employees are likely to be confronted with as a routine matter of doing business. Then the policies and procedures must be strictly followed as circumstances allow. And every use of force incident must be formally and carefully reviewed to assure that the applicable policies and procedures were followed as required. A specific Use-of-Force Report must be completed to allow for the collection of data that can be analyzed for the purpose of improving operations and supervision. Every incident of the use-of-force tells a story about the culture and attitude of staff that are in direct contact with inmates on a regular and daily basis.

On December 23, 2020, Defendants deliberately failed to follow the Use-of-Force protocols when Defendant A arbitrarily decided that Plaintiff would be forcibly removed from Housing Unit 705 for ignoring an order to lock in his cell. Defendant A intentionally escalated the use of force by individually going hands-on with Plaintiff in an apparent attempt to restrain (handcuff)

Plaintiff to prevent him from entering his cell as initially ordered. Defendant A had the opportunity and responsibility to wait for back-up to arrive on the scene that was only seconds away.  Instead, the sheriff deputies responding to the call for assistance upon entering the housing unit reacted to a physical confrontation involving a fellow deputy sheriff and an inmate.   As a result, the Defendant Deputies tackled Plaintiff to the floor with their weight on top of him.  As a result of this premature and inappropriate use of force Plaintiff's hip was severely injured.

This is a model case demonstrating why correctional policies and procedures, guidelines, custom and practices and training stress that the use of force, a physical confrontation must always be a means of last resort to gain control of a situation or individual.  It is true that some situations call for an immediate use of force at whatever level is necessary and appropriate, but many situations allow for a calculated use of force, at whatever level is necessary, to protect staff and inmates.  It is much easier to escalate a use of force then it is to de-escalate a use of force particularly one involving an active physical confrontation.

It is my opinion that Plaintiff was subjected to cruel and unusual punishment on December 23, 2020, when Defendant Wachholz, et. al., deliberately decided to ignore policy and procedures and go hands-on to place handcuffs on Plaintiff and remove him from the housing unit for disobeying an order to lock in this cell.  There were alternatives called for rather than escalating the situation to a brutal physical confrontation.

There is nothing in the record to support that the Dane County Sheriff's Office followed its own Policy and Procedures Manual, Use-of-Force Review Committee Section: 200-460 (07/24/19) that reads ***"The Use of Force Review committee will review significant use of force incidents by Deputies of the Dane County Sheriff's office to ensure force was used within Federal, State, and Sheriff's Office guidelines."*** The P&P calls for the Sheriff to appoint a panel to review any use of force where an inmate is injured.  The only review of the incident noted in the report was a cursory or informal debrief conducted by Sgt. McPherson who responded to the scene and was responsible for supervising the deputies involved in the December 23, 2020, use of force incident.  Under no circumstances is it appropriate for a supervisor who was involved in a use of force incident to conduct a review of an incident in which he or she participated.  At a minimum, a supervisor of higher rank should have collected and reviewed all reports and related information, conducted a debriefing with the staff involved - to include Sgt. McPherson - and forwarded the information to the Sheriff or an administrator acting on the Sheriff's behalf.  The record reveals that the incident was completely ignored and by doing so the inappropriate use of force was effectively condoned.  The fact that Plaintiff was seriously injured, taken to the hospital where he underwent surgery for his injuries and stayed in the hospital for seven days indicates that the Constitutional Rights of Plaintiff were of no concern to the DCSO.

The failure by the DCSO to review the circumstances that led to Plaintiff being seriously injured indicates that Plaintiff's constitutional right to be free from cruel and unusual punishment was

ignored.  It is the responsibility of the DCSO to establish the facts and truth about what happened and why on December 23, 2020, and what might be done to improve operations to avoid similar circumstances. Rather than act to protect the rights of Plaintiff and other inmates, Defendants systemically ignored their duties and responsibilities in a callous and deliberate manner.

**(ii)     Facts or data considered**

The list of documents provided and reviewed is` Attachment 1.  While all documents were reviewed for relevancy, not all were analyzed. No exhibits will be used to summarize my opinions.

**(iii)    Witness qualifications, including a list of all publications authored in the last 10 years.**

I have forty-four years of correctional experience, including twenty-two years as the managing official (Warden) of a local detention center under the auspices of an elected sheriff. In July 2021 I retired from the position of Warden of the Carroll County Detention Center in Maryland. I have a BS Degree in Criminology from the University of Maryland and have provided various consulting services for the National Institution of Corrections. I also consult directly with local jurisdictions in Maryland and across the county.

I have been acknowledged by both Federal and State Courts as an expert witness in the areas of correctional facility management and operations. I am a certified subject matter expert in correctional leadership development and a certified trainer in the areas of correctional leadership, ethics, strategic planning, facilities planning and inter-personal communications.

I worked for the Maryland Division of Correction for thirteen years beginning as a correctional officer.  I worked my way up the ranks serving as a correctional specialist, Community Adult and Rehabilitation Center Program Coordinator, Mutual Agreement Parole Program Coordinator, Asst. Director of the Office of Engineering and Planning, and Chief of Staff for former Commissioner of Correction Jon Galley, Maryland State Division of Correction.

I served ten years as the Director of Capital Improvements, Research and Development for the Montgomery County Maryland Department of Correction and Rehabilitation. As a collateral duty I managed the Montgomery County Criminal Justice Coordinating Committee.

During the last thirty-five years I have served on numerous committees, task forces, advisory groups, and councils all related to criminal justice matters, specifically adult corrections. I have provided consulting services to the Maryland Office of the Attorney General.  I was recently appointed by Maryland Governor Hogan to serve on a task force to reduce the number of DUI/DWI offenses and to improve treatment programs.

As a consultant and/or Expert Witness I have worked on numerous cases involving inmate suicides and the failure to protect inmates from serious harm. I have served as a consultant and/or Expert Witness on cases that involved wrongful death, excessive use of force, failure to protect, inadequate access to medical care, Prison Rape Elimination Act, and conditions of confinement. At this time, I have reviewed over forty-five cases as an Expert Witness.

My resume is attached as Attachment No. 2

I have not authored a publication in the last 10 years.

> **(iv)    List of all cases in which, during the previous 4 years, I testified as an expert at trial or by deposition.**

Despite actively working on numerous cases as an Expert Witness I have not been scheduled to testify in court or by deposition since 2019 due to the Covid-19 Pandemic. I am scheduled to be deposed in the very near future and a trial is scheduled for late October or early November 2022. The following is a list of the last four cases in which I testified at trial or sworn deposition.

- Jimmie D. Duncan v. D. Kenneth Horning, et al., United States District Court for the District of Maryland, Civil Action No. 8:13-CV-00448-DKC.
- Kevin Younger v. State of Maryland v. State of Maryland et al., Circuit Court for Baltimore City, Case No. 24-C-17-004752-OT
- Estate of Victoria Short v. Andrew. Stokes, Sheriff of Davie County North Carolina United States District Court, Middle District of North Carolina, Civil Action No. 1:18-CV-00741
- Cody et. al., v. City of Saint Louis in the United States District Court for the Eastern District of Missouri Eastern Division, No. 4:17-CV-02707-AGF

> **(v)    Statement of compensation**

I am compensated $250.00 per hour for review, research, report writing and telephonic discussions. I am compensated at a rate $350.00 per hour for testimony at deposition or trial. These rates do not include allowable per diem expenses associated with travel or lodging and approved miscellaneous expenses.

*George R. Hardinger*                                                            **Date:  October 4, 2022**

George R. Hardinger
Independent Consultant

9

| Documents Provided to Expert George Hardinger<br>*Joshua v. Dane County* | | |
|---|---|---|
| Document Title | Description | Date |
| 19 – Scheduling Order | Scheduling Order for Case 22-cv-24, Dkt. 19 | 4/28/2022 |
| CCI Public Records Request Response 3.3.22 | Response from Columbia Correctional Institution to our Public Records Request | 3/3/2022 |
| Incident Report | Dane County Sheriff's Office Incident Report for Date of Loss | 12/24/2020 |
| Jimmie Joshua taken down by Dane County Jail Deputies – short clip_360P.mp4 | Video of incident (sort) | 12/23/2020 |
| Joshua, Jimmie CCI Legal File | Columbia Correctional Institution Document Production | 3/3/2022 |
| Jimmie Joshua taken down by deputies – full video_360P.mp4 | Video of incident (full) | 12/23/2020 |
| Joshua, Jimmie CCI Social Service File | Columbia Correctional Institution Document Production | 3/3/2022 |
| WI DOC Medical Record Production 6.15.22 | Medical Records from WI Department of Corrections | 6/15/2022 |
| 1 – Complaint | Complaint of Western District of WI Case 22-cv-24 | 1/13/2022 |
| Def RPD Ex 1 – SOPs – Use of Force | Dane County Sheriff's Office Use of Force Policy/Procedure | 7/24/2019 |
| Aspirus Health R – 2-1-22 | Medical Records from Aspirus Health, 12/25/2021 visit after fall | 1/31/2022 |
| UW Health R – 11-1-21 | Medical Records from UW Health dated 12/24/20-7/23/21 | 9/24/2021 |
| Department of Corrections R – 6-16-22 | Medical Records from WI Department of Corrections – psych | 6/26/2022 |
| JOSHUA EX 3 – Shotliff Incident Report | Exhibit to Sean Shotliff's deposition – incident report from 12/23/2020 | 12/23/2020 |
| JOSHUA EX 2 – Wachholz Incident Report | Exhibit to Isaac Wachholz's deposition – incident report from 12/23/2020 | 12/23/2020 |
| JOSHUA EX 4 – Poquette Incident Report | Exhibit to Ben Poquette's deposition – incident report from 12/23/2020 | 12/23/2020 |
| Wachholz Isaac-Depo Trans, COND | Deposition transcript of Isaac Wachholz | 8/26/2022 |
| JOSHUA EX 1 – Jimmie Joshua taken down by Dane County Jail Deputies – short clip.mp4 | Exhibit to Defendants' depositions - video of incident | 12/23/2020 |
| ShotliffSean-Depo Trans, COND | Deposition transcript of Sean Shotliff | 8/26/2022 |
| Def RPD Ex 2 – Personnel Files of Shotliff, Wachholz, and Poquette | Personnel files of Defendants Sean Shotliff, Isaac Wachholz, and Ben Poquette | 7/12/2022 |
| Poquette Ben-Depo Trans, COND | Deposition transcript of Ben Poquette | 8/26/2022 |

# George R. Hardinger

1147 Humbert Schoolhouse Road    Westminster, Maryland 21158-1101
Telephone (443) 244-0272   E-mail: george.hardinger@gmail.com

## Relevant Correctional Experience

I have 44 years of correctional experience.  My career began as a correctional officer at the Maryland House of Corrections.  My diverse career includes working as a senior correctional specialist at a pre-release center in Baltimore City, Mutual Agreement Parole Program (MAPP) Coordinator, facilities planner for secure local jails and work release programs, Assistant Director of the Office of Engineering and Maintenance, and Chief of Staff, Commissioner of Correction (former Commissioner Jon Galley). For eight years I also worked part-time as a Substance Abuse Counselor providing both individual and group therapy to inmates.  Prior to leaving state employment I was the Public Safety Team Leader with the Department of State Planning.  For 10 years I headed up planning for the Montgomery County Department of Correction and Rehabilitation where I was responsible for planning the new Montgomery County Correctional Facility, numerous special projects, and managing the County's Criminal Justice Coordinating Commission.

I retired on July 1, 2021, as Warden of the Carroll County Detention Center in Westminster, MD, and as Past Chair and member of the local Behavioral Health and Addictions Council and as Past President and current member of the Maryland Correctional Administrators Association.  I have a BS in Criminology, University of Maryland, and provided various consultant services for the National Institution of Corrections and contracted directly with local jurisdictions in Maryland and across the country.  The Maryland Police and Correctional Commission have certified me as a Subject Matter Expert in correctional leadership practices and development. I have been a trainer in the areas of correctional leadership, ethics, strategic planning, facilities planning and inter-personal communications.

I have been acknowledged as an Expert Witness in the areas of correctional facilities management and operations. Specific areas of expertise include wrongful death, failure to protect, excessive use of force, suicide prevention protocols, Prison Rape Elimination Act (PREA), correctional management and leadership.

## Employment History

**August 1999 – July 1, 2021:  Carroll County Sheriff's Office, Warden, Carroll County Detention Center, Carroll County, Maryland.**

1

A 270-bed local detention center having all security levels including central booking, pre-trial supervision, work release, and home detention programs. Managed an $11 million budget with 109 employees. I am a Past Chairman of the Carroll County Behavioral Health and Addictions Council and served on the Board of Directors for the Partnership for a Healthier Carroll County.

**January 1989 – August 1999:   Director's Office, Department of Corrections and Rehabilitation, Montgomery County, Maryland.**
Director – Capital Improvement Projects.  I supervised the planning of emergency housing units and a new 1,000 bed detention center project.  Responsibilities included numerous special projects, evaluation of the feasibility of contractual food services, security enhancements, staffing analysis, internal investigations, oversight of adverse personnel actions, and served as special assistant to the department's director.

Administrator – Montgomery County Criminal Justice Coordinating Commission (CJCC).  In addition to the responsibilities listed above, I managed the daily operations of the CJCC, which was responsible for coordinating the planning activities of the county's criminal justice system and related agencies.

**June 1988 – January 1989:  Maryland Department of State Planning.**
Public Safety Capital Projects Team Leader.  As the senior capital budget analyst I supervised the team of analysts responsible for reviewing capital project requests for state prisons, local jails, state police and emergency management facilities.

**May 1976 – June 1988:  Maryland Division of Correction (DOC).**
I held various positions within the Maryland DOC, including:

- Special Assistant/Chief of Staff to former Commissioner Jon Galley
- Assistant Director – Office of Engineering, Maintenance and Capital Projects
- Coordinator, Mutual Agreement Parole Program (MAPP)
- Coordinator, Management Information System (MIS)
- Senior Correctional Specialist – Greenmount Avenue Pre-Release Center
- Instructor at the Police and Correctional Training Academy
- Correctional Officer – Maryland House of Correction and Roxbury Correctional Institution

## Cases on which I served as an Expert Witness:

- Doretha Conaway v. Maryland Department of Public Safety and Correctional Services, et al., Civil Action No.: 24-C-09-001965.
- Kimberly Nicholson, et al. v. State of Maryland, et al, Circuit Court for Baltimore City, Case No.: 24-09-006444.
- Michael Smith v. William Filbert, et al., Civil No. PJM-10-653.

2

- Tracey Wilson, et al., v. State of Maryland et al., Case No.: 24-C-11-006063.
- Carol Hicks v. State of Maryland, Somerset County Circuit Court, Civil Action No.: 19-C-13-016181.
- Jimmie Ruth Craven v. State of Maryland, Circuit Court for Baltimore City, Case No.: 24-C-15-001921 OT.
- Larry Washington v. Marion Tuthill, et al., U.S. District Court for the District of Maryland, Case No.: GLR-13-03767.
- Bonnie Taylor v. Somerset County Commissioners, et al., Civil Action No.: RDB-16-0336.
- Jimmy Duncan v. D. Kenneth Horning, et. al., U.S. District Court for the District of Maryland, Civil No. DKC-13-448
- Marie Noisette v. City of Philadelphia et. al., U.S. District Court for the Eastern District of Pennsylvania, Civil Action NO.: 2:16-cv-06419-GEKP
- Rasheed Iddrissue v. Nassau Count et. al., Supreme Court of the State of New York, County of Nassau, Index No. 5222/11
- Kevin Younger v. State of Maryland, et al., Circuit Court for Baltimore City, Case No. 24-C-17-004752-OT
- A.K. v. Anthony J. Annucci et al., United States District Court, Southern District of New York, 17-Civil-769 (VB).
- Estate of Victoria Christina Short v. Andrew C. Stokes, Sheriff of Davie County, North Carolina, United States District Court, Middle District of North Carolina, Civil Action No.1:18-cv-00741.
- Estate of Roland Alston, et al., Correct Care Solutions, LLC., United States District Court for the Eastern District of Pennsylvania, Civil Action No. 19-5583.
- Cody et al., City of Saint Louis, United States District Court, Eastern District of Missouri Eastern Division, Case No., 4-17-cv-2710-AGF.
- Estate of Arthur Phillips, et al., Correct Care Solutions, LLC., and the Pennsylvania Department of Correction, United States District Court for the Eastern District of Pennsylvania, Civil Action No., 19-3822.
- Katelyn Simmons, et al v. Ilene Shapiro, et al; United States District Court, Northern District of Ohio; Case No. 5:20 – CV 00883, Magistrate Kathleen Burke
- Ilya Belous v James Gannon, et al; Untied States District Court, District of New Jersey, Civil Action No.: 2:19-CV-6186.
- Keith L. Cooper, Jr., v Florida Department of Corrections, et al; United States District Court Middle District of Florida Jacksonville Division, Civil Acton Case No.: 3:19-cv-00309-BJD-MCR.
- Estate of Kari McCarty v Gary Ferguson, Commonwealth of Kentucky, 44th Judicial Circuit, Bell Circuit Court, Civil Action.: 17-ci-0038

## Military Service
U.S. Army, Army Security Agency (ASA) 1968-1972

3

Top Secret Clearance, Top Secret Security Control Officer and Analyst
Honorable Discharge 1972

## Education
University of Maryland, College Park, Maryland
	Bachelor of Science – Criminology/Minor in Urban Studies, 1978
Anne Arundel Community College, Arnold, Maryland
	Associate of Arts – Social Science, Law Enforcement, 1976

## Professional Training
**National Institute of Corrections Technical Assistance Services**
	Planning on New Institutions I & II (PONI 1 & II)
	How to Open a New Institution (HONI)
	Review of Design and Construction Documents
	Transition Planning into a New Facility
	Operating Budget Development & Staffing Analysis
	Correctional Leadership For the 21st Century (Trainer to provide technical assistance)

**Wharton School of Management – Criminal Justice Planning**
	Strategic Planning for Managing Correctional Systems
	Management by Objectives in Time of Crisis – Overcrowding

**Instructor, Maryland State Police and Correctional Training Commission**
	Training for Trainers
	Stress, Teaching Correctional Employees How to Cope
	Entry Level Training for Correctional Employees
	Leadership Development, Ethics, Interpersonal Communications

## Professional Organizations
	Past President, Maryland Correctional Administrators Association, member
	American Jail Association (AJA), member
	American Correctional Association (ACA), member

## Personal Information
	George Ray Hardinger
	1147 Humbert Schoolhouse Road
	Westminster, MD 21158
	Mobile 443-244-0272, E-mail: george.hardinger@gmail.com

4