IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JIMMIE JOSHUA,

                     Plaintiff,                    OPINION AND ORDER

v.

                                                    22-cv-24-wmc

ISAAC WACHHOLZ,
SEAN SHOTLIFF, and
BEN POQUETTE,

                     Defendants.

While confined at the Dane County Jail on December 23, 2020, plaintiff Jimmie Joshua claims that three jail deputies needlessly and forcefully removed him from his cell and took him to the ground, breaking Joshua's hip in the process. Thus, Joshua is proceeding in this lawsuit on Fourteenth Amendment excessive force claims against Dane County Jail Deputy Isaac Wachholz for initiating an effort to pull him out of his cell, and against Deputies Wachholz, Sean Shotliff and Ben Poquette for their respective subsequent roles in forcefully removing Joshua from his cell and taking him to the floor in a manner that broke his hip. All defendants now seek summary judgment on the merits of these claims, or alternatively, on their entitlement to qualified immunity. (Dkt. #25.) The available video footage captured only some of this incident and other evidence, including the parties' depositions, create genuine disputes of fact as to whether Joshua was resisting the deputies while they were moving him, so a reasonable jury *could* find that (1) defendant Wachholz's initial use of force was unjustified, and (2) all three defendants used excessive force. Therefore, the court will deny defendants' motion, and

1

this case will proceed to trial.[1]

## UNDISPUTED FACTS

### A.  Parties

Joshua was an inmate at the Dane County Jail on December 23, 2020, and he was aware of the jail's rules and procedures, including that inmates must follow orders and may not act in a disorderly manner, cause a disturbance, or attempt to violate jail rules. Joshua also understood the jail's "lock down" commands.  Locking down is when an inmate steps into his or her cellblock and shuts the door.  Joshua understood that inmates were not allowed to argue about a lock down order.[2]  Defendants Isaac Wachholz, Sean Shotliff and Ben Poquette were deputies at the jail at that time and had received use of force training.  Defendants did not have any problems with Joshua prior to December 23, 2020.

### B.  Events of December 23, 2020

On December 23, 2020, Joshua had COVID-19 and was housed in cellblock 705 with other inmates with COVID-19.  Inmates in cellblock 705 were allowed to be out of

---

[1] In opposition to defendants' summary judgment motion, Joshua also attempts to assert claims under the Eighth Amendment for failure to intervene against defendants Shotliff and Poquette. However, the court did *not* grant Joshua leave to proceed against any defendant based on a failure to intervene claim.  Again, the only claims proceeding to trial are Fourteenth Amendment excessive force claims against all three defendants.

[2]  Defendants submit numerous proposed findings of fact related to Joshua's history of misconduct and placement in restrictive housing.  However, they neither attested to nor testified that any of the three defendants was aware of either on December 23, 2020, or more generally, knew that Joshua had a history of problematic behavior at the jail on that date.  Therefore, at least for purposes of their summary judgment motion, Joshua's conduct at the jail except during defendants' alleged misuse of force is immaterial. *See Burton v. City of Zion*, 901 F.3d 772, 780 (7th Cir. 2018) (emphasizing that the question of reasonableness depends on "the facts and circumstances before them and known to them at the time" of the incident).

their cell for one hour per day. There were four cells in that cellblock, and one inmate was allowed out at a time. The cellblock also shared one computer tablet that inmates could use to make calls during their out of cell time.

That day Joshua had been out of his cell for about an hour and a half as of 6:30 p.m. Around that time, Deputy Wachholz conducted a security check in the cellblock and directed Joshua to lock down. After Joshua refused, Wachholz directed Joshua to lock down at least twice more, but he again refused, each time telling defendant Wachholz to take him to cellblock 717, which houses inmates with behavioral issues. At that point, Joshua had clearly violated six, specific jail rules, causing Wachholz to conclude that Joshua was a security threat and should be moved to cellblock 717. Deputy Shotliff saw what was happening through a window, and radioed Deputy Poquette to assist Wachholz.

After Wachholz ordered Joshua to put his hands behind his back to be handcuffed and taken to cellblock 717, video footage from the cellblock captured what happened next. ("Video" (dkt. #33-4).) In particular, Wachholz initially moved towards Joshua and reached for his arm with two hands, prompting Joshua to pull away but continue facing Wachholz. Defendant Wachholz then stepped forward again, motioning for Joshua to come toward him twice; instead, Joshua started backing up in the direction of his cell. (*Id.*, Ex. 3 at 9:30-35; Ex. 4 at 9:30-35.) Although conceding that he was disobeying Wachholz's repeated commands to lock down, as well as to assume a position consistent with his being safely handcuffed, Joshua maintains that he was merely retreating towards his cell to lock down.

3

The footage next shows that as Joshua continued to back away, Wachholz again used both hands, this time to grab Joshua's arm near his bicep, which according to Joshua, prevented him from locking down in his cell.  Nevertheless, Joshua still moved backwards into his cell, and because he did not let go of Joshua's arm, Wachholz went along with him.  (Ex. 4 at 9:36-9:39.)  At that time, the two moved into Joshua's cell and out of the camera's fixed view.  Still, the parties agree that Wachholz maintained physical contact with Joshua, although Joshua asserts that his back was by then towards Wachholz.

Within seconds of Joshua's original interaction with Wachholz, Deputy Shotliff ran into the cellblock and attempted to secure Joshua's left arm.  By then, however, Joshua contends that he was compliant:  his hands were behind his back; he made no attempt to injure or threaten the deputies; and he told them that he was not resisting.  (Joshua Dep. (dkt. #24) 81, 87-88.)  In contrast, Shotliff's impression was that Joshua was trying to get away from them.  (Shotliff Dep. (dkt. #22) 17.)  A few seconds later, Deputy Poquette entered and saw that Wachholz and Shotliff were trying to secure Joshua against the cell wall.

Defendants also maintain that they next tried to move Joshua out of the cell so they could stabilize him.  Shotliff next directed the other two deputies to take Joshua to the ground because their efforts to secure Joshua had failed, and although not visible on video, Joshua had by then moved his hands to his chest and he was turning and twisting his body.  (Shotliff Dep. (dkt. #22) 16, 18.)  However, Joshua maintains that he remained compliant at that point because his hands were still behind his back, and he

told the deputies he was not resisting. By that time, the video footage only shows the three deputies moving Joshua out of his cell with his arms held down either at his sides or behind his back, and as they rounded the corner out of the cell door towards the camera, the deputies taking Joshua to the ground. (Video, Ex. 4 at 9:55-10:04.)

Although the officers did not use any hand strikes, knee strikes, kicks, or punches, Joshua maintains that he was slammed onto the ground and tugged around by the officers. Ultimately, the officers handcuffed Joshua behind his back and a nurse evaluated him. Joshua immediately complained about his hip, which was broken.

Joshua's expert, George Hardinger, reviewed the video footage and other information relevant to this case. He opines that Wachholz used excessive force by grabbing Joshua's arm as he was retreating into his cell, both because Joshua was not a threat at that time and backup officers were already en route. However, Hardinger did not opine that the takedown by all three defendants constituted use of excessive force.

OPINION

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). At summary judgment, disputed facts are viewed in a light

most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

Although Joshua's precise incarceration status as of December 23, 2020, is unclear, defendants assume for purposes of summary judgment that Joshua's excessive force claims fall under the Fourteenth Amendment's due process clause. To prove this claim, the plaintiff must show "that the force purposely or knowingly used against him was objectively unreasonable" based on the following factors: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

"[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Still, courts must consider "the perspective of a reasonable officer at the scene" and "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (internal quotation marks and citation omitted).

There is no dispute that Joshua's injury was severe, and although defendants

contend that their use of force was appropriate given the security risk Joshua presented, factual disputes preclude summary judgment in their favor. As an initial matter, a jury could reasonably conclude that Wachholz's initial use of force was objectively unreasonable.[3] While Wachholz contends that Joshua posed a security threat and possibly a threat to himself because Joshua was initially standing between Wachholz and the only entry or exit to cellblock 705, no other evidence suggests that Joshua was a physical threat at the time that Wachholz initiated contact. Moreover, at the time that Wachholz grabbed him, Joshua had backed up to the entry of his cell (Video, Ex. 4 at 9:30-9:40), and Joshua contends that by then he was physically retreating to his cell in an attempt to comply with Wachholz's lock down command.

In reply, Wachholz correctly points out that Joshua's subjective intent has no impact on a use of force analysis. *See Smith v. Ball State Univ.*, 295 F.3d 763, 771 (7th Cir. 2002) (in circumstance in which plaintiff was experiencing diabetic shock, officer could reasonably misconstrue the plaintiff's unresponsiveness – as resistance, justifying the minimal use of force); *Matt v. City of Green Bay*, No. 21-C-439, 2022 WL 1063724 (E.D. Wis. April 8, 2022) (officer's hand-strike was objectively unreasonable even though plaintiff did not intentionally kick the officer because officer reasonably believed that the plaintiff posed a threat). Rather, the objective reasonableness inquiry turns on "how a reasonable officer would have perceived the circumstances," not on Joshua's intent. *See Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (citation omitted).

---

[3] Of course, whether Wachholz's initial use of force could be causally tied to Joshua's ultimate broken hip will be for the jury to decide. *See Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("In constitutional-tort cases as in other cases, 'a man is responsible for the natural consequences of his actions.'") (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)).

Still, the video footage shows that Wachholz would have seen Joshua backing away from him towards his cell. Thus, without considering Joshua's subjective intent, a reasonable jury could conclude from the footage that a reasonable officer would have recognized, at minimum, that Joshua was retreating and presented no threat to him physically. In fairness, Joshua's behavior at that point still posed a safety and security concern because he was violating jail policies and Wachholz's direct commands to lock down and to be handcuffed. Yet in viewing all the facts and circumstances, a reasonable jury could find that the objective security threat Joshua posed did not justify Wachholz initiating physical contact. Specifically, Joshua was not verbally threatening Wachholz; he was backing away from Wachholz towards his cell door; and he did not present a safety threat to other inmates, as the only inmate in the cellblock. Indeed, Wachholz offers no specific explanation as to why he needed to make physical contact with Joshua at the moment, with Joshua no longer blocking Wachholz's retreat, moving backwards into his cell and other deputies on their way to assist him. Although a jury ultimately may credit Wachholz's safety concerns, the video footage and the opinion of plaintiff's expert arguably supports a finding that an objectively reasonable officer would not have initiated physical contact.

While Wachholz further argues that his use of force was *de minimus* because he did not strike Joshua or employ a chemical agent or taser, his initial contact and refusal to disengage unquestionably escalated the confrontation, prompting Shotliff and Poquette to join in an on-going physical altercation, as opposed to a controlled movement of Joshua to cellblock 717. At that point, there is no question that some force was

necessary because Joshua and Wachholz were already physically engaged. However, that the initial need to physically subdue Joshua was "justified does not mean that all subsequent uses of force were similarly justified," and the "totality of the circumstance, not the first forcible act . . . determines objective reasonableness." *Abbot v. Sangamon Cnty., Ill.*, 705 F.3d 706, 729 (7th Cir. 2013). Because there is a material, factual dispute as to dispute whether Joshua resisted the deputies' efforts to handcuff him, a jury could also conclude that the takedown resulting in a broken hip was objectively unreasonable.

In particular, Joshua maintains he was not resisting them in the cell, having testified in his deposition that his hands were behind his back, and he did not threaten the deputies but instead told them that he was not resisting. In contrast, Shotliff and Poquette maintain that the takedown was an appropriate and a necessary next step *because* Joshua continued to resist by twisting away from their grasp.

Unfortunately, the video footage does not conclusively resolve the parties' factual dispute. Defendants point to a snippet of the video footage that they contend indisputably shows that Joshua *was* resisting during defendants' efforts to secure him: the few seconds in the footage in which Joshua's foot is seen at the threshold of his cell. (Video, Ex. 4 at 9:55-10:00). Although this footage does show that Joshua's foot appears to be planted in place on the threshold, Joshua's body is not in view, and his foot placement could just as easily be perceived as an attempt by Joshua not to lose his footing. Only "[w]hen opposing parties tell two different stories, one of which is *blatantly* contradicted by [the video evidence] so that no reasonable jury could believe it," should a

9

court "adopt that version of the facts for purposes of ruling on a summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 381 (2007) (emphasis added). Because the footage does not show why Joshua's foot appears planted in the video footage, a jury will have to decide whether Joshua was resisting the deputies.

Defendants cite decisions in which courts, including this court, granted summary judgment to jail officers who used force to secure a detainee. In each case, however, there was no dispute that the detainee was resisting the officers involved. *See King v. Spears*, No. 16-cv-144-wmc, 2019 WL 632290, at *6-7 (W.D. Wis. Feb. 14, 2019) (use of chemical spray was reasonable given defendants' knowledge of his prior history and King's continued, uninterrupted resistance, verbally as well as by wresting with and pushing away from the officers); *Huff v. Tabler*, No. 18-cv-122-JD-MGG, 2019 WL 3499494, at *3 (N.D. Ind. July 31, 2019) (defendants were entitled to summary judgment on excessive force claims because plaintiff refused to return to cell, then actively resisted officers when they were escorting him to another cell). Here, in contrast, if a jury were to believe that Joshua was allowing the deputies to handcuff him, it could reasonably conclude that the takedown was gratuitous, and thus unreasonable. *See Price v. McCoy*, No. 19-cv-2560, 2021 WL 5179918, at *7 (N.D. Ill. Nov. 8, 2021) (denying summary judgment even though plaintiff initially resisted and refused to follow directives because plaintiff insisted that he stopped resisting and officers continued to punch and kick him).

Defendants' remaining arguments fail on this record as well. For example, defendants point out that Joshua's expert did not opine that the takedown itself was

10

objectively unreasonable, focusing solely on Wachholz's decision to initiate contact. Still, expert opinion is just one piece of evidence, and it is not apparent that expert testimony will be necessary for Joshua to succeed on his excessive force claim related to the takedown. *See Pena v. Leombruni*, 200 F.3d 1031, 1034 (7th Cir. 1999) (expert testimony was unnecessary to determine reasonableness of force when because that question was within lay competence). Likewise, the absence of an opinion about whether defendants' use of force, particularly taking Joshua to the ground, does not establish that their use of force was reasonable given the factual dispute surrounding their takedown maneuver. Of course, a jury might consider that Joshua's expert does not offer an opinion on whether the deputies' use of force in the cell and during the takedown was objectively unreasonable.[4]

Finally, defendants point out that the severity of Joshua's injury should not drive whether his claim survives summary judgment, which is also true. *See Johnson v. Rogers*, 944 F.3d 966, 969 (7th Cir. 2019) (collecting cases for the proposition that it may be reasonable for officer to use a takedown maneuver in the face of even mild resistance). A takedown can be an appropriate intervention to gain compliance over a detainee who refuses to be subdued while standing. Again, however, Joshua insists that he was compliant, and the video footage does not clearly show that he was not when defendants removed him from his cell and took him to the ground.

As for defendants' alternative qualified immunity argument, the same factual disputes related to Joshua's compliance preclude finding any defendant entitled to

---

[4] How and whether the jury considers that fact may be a subject for proposed jury instructions and motions *in limine*.

immunity from trial as well. *See Stewardson v. Biggs*, 43 F.4th 732, 736 (7th Cir. 2022) (dismissing interlocutory appeal of denial of qualified immunity because factual disputes precluded district court from determining whether defendant violated clearly established law). Although defendants may reassert the qualified immunity defense at the close of plaintiff's case and close of the evidence, it appears that a jury must decide whether defendants' use of force was objectively unreasonable under current law.

## ORDER

IT IS ORDERED that defendants' motion for summary judgment (dkt. #25) is DENIED.

Entered this 21st day of April, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge